## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM STERNER,         ) | |
|          ) | |
|       Plaintiff,         ) | Case No. _____ |
|          ) | |
|     v.         ) | JURY TRIAL DEMANDED |
|          ) | |
| THE HABIT RESTAURANTS INC., RUSSELL ) | |
| W. BENDEL, CHRISTOPHER K. REILLY, ) | |
| ALLAN W. KARP, IRA ZECHER, A. WILLIAM ) | |
| ALLEN III, IRA FILS, JOSEPH J. KADOW, and ) | |
| KARIN TIMPONE,         ) | |
|          ) | |
|       Defendants.         ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, William Sterner, by his undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against The Habit Restaurants, Inc. ("Habit" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Habit, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed acquisition of Habit by YUM! Brands, Inc. ("Parent") and YEB Newco Inc.

1

("Merger Sub", and together with Parent, "YUM!").

2.      On January 6, 2020, Habit and YUM! issued announced that they had entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Habit would merge with and into YUM! (the "Proposed Transaction").

3.      Pursuant to the terms of the Merger Agreement, Habit's shareholders will be entitled to receive $14.00 per share in cash (the "Merger Consideration").

4.      On February 4, 2020, in order to convince Habit's public common stockholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

5.      In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Habit's financial advisors, Piper Sandler & Co. ("Piper Sandler" or the "Financial Advisors") regarding the Proposed Transaction.

6.      The Proposed Transaction is expected to close in the second quarter of 2020 and the special meeting of the Company's shareholders to vote on the Proposed Transaction will be scheduled in the coming weeks.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Habit's

public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Habit's common stock trades on the Nasdaq Global Market ("Nasdaq"), which is headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

//

**PARTIES**

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Habit common stock.

12.     Defendant Habit is a Delaware corporation with its principal executive offices located at 17320 Red Hill Avenue, Suite 140, Irvine, California 92614.

13.     Defendant Russell W. Bendel ("Bendel") is, and has been at all relevant times, the Company's Chief Executive Officer and a director of the Company.

14.     Defendant Christopher K. Reilly ("Reilly") is, and has been at all relevant times, a director of the Company.

15.     Defendant Allan W. Karp ("Karp") is, and has been at all relevant times, a director of the Company.

16.     Defendant Ira Zecher ("Zecher") is, and has been at all relevant times, a director of the Company.

17.     Defendant A. William Allen III ("Allen") is, and has been at all relevant times, a director of the Company.

18.     Defendant Ira Fils ("Fils") is, and has been at all relevant times, a director of the Company.

19.     Defendant Joseph J. Kadow ("Kadow") is, and has been at all relevant times, relevant times, a director of the Company.

20.     Defendant Karin Timpone ("Timpone") is, and has been at all relevant times, a director of the Company.

21.     The Defendants identified in paragraphs 13 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the

"Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

22.    Habit is a publicly traded Delaware corporation that is a burger-centric, fast-casual restaurant concept that specializes in preparing fresh, made-to-order chargrilled burgers and sandwiches featuring USDA choice tri-tip steak, grilled chicken and sushi-grade tuna cooked over an open flame.  Habit also offers made-to-order salads, as well as side dishes and beverages. The Company's common stock trades on the Nasdaq under the ticker symbol "HABT."

23.    The first Habit Burger Grill opened in Santa Barbara, California in 1969.  Since then, Habit has grown to over 270 restaurants across 13 states.

24.    In connection with Habit's initial public offering of its shares of Class A common stock, Habit entered into a tax receivable agreement (the "TRA") with certain equity owners of equity interests of Habit LLC as of immediately prior to the initial public offering, which provided for certain payments to these equity holders and their assignees by Habit with respect to certain tax attributes of Habit, including in connection with a change in control of Habit.

25.    The directors and executive officers of Habit who were entitled to receive payments pursuant to the TRA include Defendants Karp, Reilly, Bendel, and Fils.

26.    Prior to the announcement of the Proposed Transaction, Habit had excellent growth prospects.  For example, Habit was recently named Best Regional Food in USA Today's 2019 Best Readers' Choice Awards.

27.    Indeed, on October 30, 2019, just a few months before the Proposed Transaction was announced, Habit issued a press release entitled *The Habit Restaurants, Inc. Announces Third Quarter 2019 Financial Results*, which announced, "strong results" and affirmed its

strategies, stating in part:

> "We're pleased to report strong results this quarter, which included our sixth consecutive quarter of company-operated comparable restaurant sales growth, at 3.1%. We also continued to make progress on our mission to be a total access brand to our customers. Our total number of drive-thrus reached 51 during the quarter, we also installed self-ordering kiosks in our 20th restaurant, and saw our mobile app downloads and usage increase dramatically in the third quarter," said Russ Bendel, President and Chief Executive Officer of The Habit. "During the quarter we opened six new company-operated locations, including four drive-thru locations and continue to look to open 21 company-operated locations in 2019. For 2020 we expect to open a total of 29 to 35 locations, which would include 12 to 15 franchise locations, more than doubling our expected franchise openings in 2019."

28.   Thus, the Proposed Transaction comes at a time when Habit's future success was not fully reflected by its share price. As a result, the Proposed Transaction will "compensate" Habit's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

29.   Despite Habit's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out Habit's stockholders and deprives them the ability to partake in Habit's growth. The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**The Proposed Transaction**

30.   On January 6, 2020, Habit and YUM! issued a joint press release announcing the Proposed Transaction:

**Yum! Brands to Acquire The Habit Restaurants, Inc.**

January 6, 2020

LOUISVILLE, Ky. & IRVINE, Calif.--(BUSINESS WIRE)— Yum! Brands, Inc. (YUM) and The Habit Restaurants, Inc. (HABT) ("The Habit Burger Grill") today

announced that they have entered into a definitive agreement pursuant to which Yum! Brands will acquire all of the issued and outstanding common shares of The Habit Burger Grill for $14 per share in cash or a total of approximately $375 million. The board of directors of The Habit Burger Grill, acting on the recommendation of a special committee composed of non-executive independent directors, has unanimously approved the transaction.

This press release features multimedia. View the full release here:
https://www.businesswire.com/news/home/20200106005474/en/

Yum! Brands, Inc. and The Habit Restaurants, Inc. today announced that they have entered into a definitive agreement for Yum! Brands to acquire The Habit Restaurants, which operates the award-winning fast-casual concept The Habit Burger Grill, featuring a flavor-forward variety of made-to-order items uniquely chargrilled over an open flame. (Photo: Business Wire)

The acquisition of The Habit Burger Grill will add an award-winning fast-casual concept with a loyal fan-base to Yum! Brands, the world's largest restaurant company in terms of units and parent of the KFC, Pizza Hut and Taco Bell global brands. Founded in California in 1969, The Habit Burger Grill offers a flavor-forward variety of made-to-order items uniquely chargrilled over an open flame. Fan favorites include charburgers, hand-filleted and marinated chargrilled chicken sandwiches, sushi-grade chargrilled ahi tuna sandwiches, fresh salads, craveable sides and handmade frozen treats. The Habit Burger Grill, named Best Regional Fast Food in USA Today's 2019 Best Readers' Choice Awards, operates nearly 300 company-owned and franchised restaurants across the U.S. and in China.

David Gibbs, Chief Executive Officer of Yum! Brands, said, "We've emerged from our three-year transformation stronger and in a better position to accelerate the growth of our existing brands and leverage our scale to unlock value from strategic acquisitions."

Gibbs continued, "As a fast-casual concept with strong unit economics, The Habit Burger Grill is a fantastic addition to the Yum! family and has significant untapped growth potential in the U.S. and internationally. With its delicious burgers and fresh proteins chargrilled over an open flame, The Habit Burger Grill offers consumers a diverse, California-style menu with premium ingredients at a QSR-like value. The transaction is a win-win because it allows us to offer an exciting new investment to our franchisees and to expand an award-winning, trend-forward brand through the power of Yum!'s unmatched scale and strengths in franchising, purchasing and brand-building."

Yum! Brands estimates minimal impact to non-GAAP earnings per share before special items in 2020, with accretion beginning in 2021 and increasing thereafter.

Russell Bendel, President and Chief Executive Officer of The Habit Burger Grill, said, "Over the past few years, we've focused on becoming a total access brand by growing our delivery business, expanding our online ordering and mobile channels and enhancing the in-store experience by introducing drive-thrus, kiosks and technology-centric

solutions for operations. We're proud these and other actions have made The Habit Burger Grill an attractive candidate for a transaction of this kind. On behalf of The Habit Burger Grill Board of Directors, this transaction represents an exciting new chapter to strengthen and significantly grow The Habit Burger Grill by leveraging Yum! Brands' global scale, resources and franchising capabilities. We're confident the agreement delivers immediate value to The Habit Burger Grill shareholders and will greatly benefit our beloved brand, team members, franchisees and loyal guests for many years to come."

The Habit Burger Grill Highlights

Customer experience of quality, hospitality, convenience and QSR-like value. The Habit Burger Grill is focused on delivering a unique customer experience, served up by talented team members and underpinned by outstanding operations capabilities. The brand pairs the premium quality and hospitality consumers associate with full-service and fast-casual chains with the strengths in value, convenience and digital access of quick-service restaurants.

Diverse, grill-focused and California-style menu. It offers customers a diverse menu featuring a distinctive chargrilled preparation technique to deliver an appealing variety of burgers, chicken, tuna and steak featured in its sandwiches and salads, which are made-to-order using fresh ingredients.

Modern asset strategy to drive traffic. The Habit Burger Grill believes its investment in contemporary restaurant design – featuring open kitchens, outdoor patios and interiors enhanced with natural light, polished stone and hardwood accents – has contributed to its balanced day part mix of approximately 50 percent lunch and 50 percent dinner.

Expanding digital and delivery capabilities. Over the past couple of years, The Habit Burger Grill has been enhancing the customer experience through delivery partnerships and by introducing online ordering, a mobile app, restaurant kiosks, drive-thrus and technology-centric solutions to deliver excellent store operations.

Strong unit economics and growth. From fiscal year 2009 to 2018, The Habit Burger Grill grew its company-operated restaurant average unit volumes (AUVs) by 49.9%, from approximately $1.2 million to $1.9 million, respectively. In the same time period, The Habit Burger Grill grew its total units at a 28.4% compound annual growth rate.

Transaction Details

Yum! Brands intends to fund the transaction using cash on hand and available borrowing capacity under its credit facilities.

The transaction is subject to approval by The Habit Burger Grill's stockholders, regulatory approval and other customary closing conditions. The transaction is expected to be completed by the end of the second quarter of 2020.

Following the closing of the transaction, The Habit Burger Grill will remain based in Irvine, Calif., and will continue to be managed by The Habit Burger Grill's President and

CEO Russell Bendel and Chief Financial Officer Ira Fils. Mr. Bendel will report directly to David Gibbs.

BofA Securities, Inc. acted as financial advisor and Mayer Brown LLP acted as legal advisor to Yum! Brands. Piper Sandler Companies (formerly Piper Jaffray Companies) acted as financial advisor and Ropes & Gray LLP acted as legal advisor to The Habit Burger Grill.

**The Preclusive Deal Protection Devices**

31.     To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

32.     The Merger Agreement is protected by "no-shop" provisions that prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

33.     These no-shop provisions also require the Board to provide YUM! with written notice of any Acquisition Proposal and further requires the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Acquisition Proposal and negotiate with YUM! following YUM!'s receipt of the notice, so that YUM! has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

34.     In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of $13,125,000.00 with respect to any termination under the no-shop provision.

35.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these

preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

36.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Proxy Omits Material Information**

37.     On or about February 4, 2020, in order to convince Habit's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

38.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction that implicate the Individual Defendants' conflicts of interests; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

    **A.   The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

39.     The Proxy fails to provide material information regarding the background of the merger that implicates the Individual Defendants' potential conflicts of interest and the possibility that the Merger Consideration is inadequate.

40.     Page 28 of the Proxy states that Habit executed confidentiality agreements that included standstill provisions with 48 potential counterparties.  The Proxy fails to disclose whether these standstill agreements included (i) "Don't Ask Don't Waive" ("DADW")

provisions, or (ii) "fallaway" provisions that terminated the standstill obligations upon announcement of the proposed transaction, and thus fails to disclose whether these potential counterparties continue to remain subject to standstill obligations at this time. This information is material to Habit's shareholders because the existence of such standstill obligations may prevent a competing counterparty from making a Superior Proposal.

41.    The Proxy also fails to disclose whether the confidentiality agreement that Bidder Y was required to execute prior to participating in the bidding process contained a standstill agreement and, if so, whether that standstill agreement included a DADW or fallaway provision and whether Bidder Y continues to remain subject to standstill obligations. This information is material to Habit's shareholders because Bidder Y was one of the few potential counterparties that continued to participate in the process through December 2019 but Bidder Y did not actually submit a final bid due to the rushed final round of the bidding process.

42.    The Proxy fails to disclose whether the Special Committee, its financial advisors, the Board, and/or management discussed the possibility that the TRA Holders should help shoulder the reduction in company value contemplated by YUM!'s revised bid following Habit's adjustment to its balance sheet in late December 2019 as Defendants Fils and Bendel, Habit's Chief Financial Officer and Chief Executive Officer, respectively, discussed on December 31, 2020. This information is material to Habit's shareholders because the balance sheet adjustment caused a $0.13 per share reduction in the Merger Consideration for Habit's public minority investors but did not affect the value of the payments that the TRA Holders, including Defendants Karp, Reilly, Bendel, and Fils were entitled to receive under the TRA Amendment at all.

**B.    The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

43.    The Proxy also omits material information that renders Piper Sandler's Fairness

Analysis materially misleading.

44.    The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

45.    With respect to both the Original FY 2019E to FY 2023E Company Projections and the Updated FY 2019E and Original FY 2020E to FY 2023E Company Projections, Management Case and Historical Growth Capital Expenditure Case Management Projections, the Proxy fails to disclose: (i) the Unlevered after-tax free cash flow projections calculated for purposes of the discounted cash flow analysis, and also omits the following items used in deriving the cash flow projections, including (ii) Changes in working capital, (iii) Capital expenditure costs, and (iv) Any other line items used in the calculation of unlevered free cash flow.  With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

46.    Indeed, given that Habit's public investors stand to receive $0.13 per share *less* than they would have received under the Original Projections in part because of "higher than expected capital expenditure costs in the first of 2020" and "working capital related cash flow, which resulted in higher than expected cash outlays in the first half of 2020," *see* Proxy at 40, this information is clearly material to shareholders trying to decide how to vote on the Proposed Transaction.

47.    With respect to Piper Sandler's *Selected Public Companies Analysis* beginning on Page 53, the Proxy fails to disclose (i) the criteria that Piper Sandler relied on in selecting the purportedly comparable companies, (ii) the individual trading multiples for each selected company, and (iii) the enterprise valuations of each selected company.  Indeed, with only seven (7) companies included in the analysis, summarizing the results only by range and omitting any data with respect to each individual company or even the variance or central tendency of the aggregate data is unquestionably material to shareholders trying to decide how much weight, if any, to place on the analysis.

48.    With respect to Piper Sandler's *Selected Precedent Transactions Analysis* beginning on Page 54, the Proxy fails to disclose (i) the criteria that Piper Sandler relied on in selecting the purportedly comparable transaction, (ii) the purchase price for the companies being acquired in each transaction, and (iii) the individual EBITDA multiples implied in each transaction.  Again, with only nineteen (19) companies included in the analysis, summarizing the results only by range and omitting any data with respect to each individual company or even the variance or central tendency of the aggregate data is unquestionably material to shareholders trying to decide how much weight, if any, to place on the analysis.

49.    With respect to Piper Sandler's *Discounted Cash Flow Analysis*, ("DCF")

beginning on Page 55, the Proxy fails to: (i) disclose the cash flow amounts, (ii) fully disclose Piper Sandler's rationale and basis for selecting discount rate ranges from 10.9% to 15.9%, (iii) fully disclose Piper Sandler's rationale and basis for applying a range of EBITDA exit multiples of 7.6x to 9.6x, and (iv) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and EBITDA exit multiples.

50.    This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges

14

properly value the Company or were the result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed Transaction.

51.     With respect to Piper Sandler's *Premiums Paid Analysis* beginning on Page 56, the Proxy fails to disclose (i) the identity of each transactions, (ii) the implied value in each transaction, (iii) the implied premium in each transaction, (iii) whether the transaction was a cash merger, a stock merger, or a cash/stock mix, and (iv) whether Piper Sandler made any attempt to account for "disturbances" to stock price that occurred prior to the announcement of a transaction, for example a "jump" in stock price that occurred because a company announced that it was anticipating a merger before any merger was, in fact, finalized. *See, e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y. 1994) ("The fact that Columbia stock jumped 25 percent when Columbia finally announced in September 1989 that it was engaged in acquisition discussions with an unannounced suitor is convincing evidence that whatever 'acquisition expectations' were previously built into Columbia stock before this date were less than fully confident ones."). Without this information the Company's public stockholders have no way to know whether the premium ranges fairly represent the results of the *Premiums Paid Analysis* or whether this premium range effectively undervalues the Company.

52.     If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest. The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the information related to the

projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.  Thus, Defendants' omission renders the projections disclosed in the Proxy misleading.

53.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

54.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

56.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any

material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading." 17 C.F.R. § 240.14a-9.

57.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-

9 if other SEC regulations specifically require disclosure of the omitted information.

58.     Defendants have issued the Proxy with the intention of soliciting the Company's

common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants

reviewed  and  authorized  the  dissemination  of  the  Proxy,  which  fails  to  provide  critical

information regarding the valuation analyses performed by the Company's Financial Advisors in

support of its fairness opinion.

59.     In so doing, Defendants made untrue statements of fact and/or omitted material

facts necessary to make the statements made not misleading.  Each of the Individual Defendants,

by virtue of their roles as officers and/or directors, were aware of the omitted information but

failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were

therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated  or  omitted  from  the  Proxy,  but  nonetheless  failed  to  obtain  and  disclose  such

information  to  the  Company's  shareholders  although  they  could  have  done  so  without

extraordinary effort.

60.     The Individual Defendants knew or were negligent in not knowing that the Proxy

is materially misleading and omits material facts that are necessary to render it not misleading.

The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted

information identified above in connection with their decision to approve and recommend the

Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed

and discussed its financial analyses with the Board, and further states that the Board considered

the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

61. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

62. The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

63. The misrepresentations and omissions in the Proxy are material to Plaintiff, who

will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

64.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

66.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

68.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.   The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

69.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

70.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

71.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted

from the Proxy;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result

of their wrongdoing;

C.      Awarding Plaintiff, the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 12, 2020

**MONTEVERDE & ASSOCIATES PC**

By:   _/s/ Juan E. Monteverde_
   Juan E. Monteverde (JM-8169)
   The Empire State Building
   350 Fifth Avenue, Suite 4405
   New York, NY 10118
**OF COUNSEL:**
   Tel:(212) 971-1341
   Fax:(212) 202-7880
**ADEMI & O'REILLY, LLP**
   Email: jmonteverde@monteverdelaw.com
Guri Ademi
Jesse Fruchter
   *Attorneys for Plaintiff*
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
   jfruchter@ademilaw.com

*Attorneys for Plaintiff*